This morning I'd like to talk about two things that are probably the most important things in this case. The first one would be the intelligence waiver. The second would be plain error analysis that probably applies relative to the physical draft of the testing provision. As I've submitted in my papers, there was a particular notation in the plea agreement that provided that there should be the physical draft of testing should only be supported, would only apply to the defendant if it was supported by the facts of the defendant's case in the relevant case law. I'm not sure if our position can be of any grade that that isn't the case. And if there was no analysis by the court to suggest that it wasn't the case. And the reason I bring this up is I think this is what makes this case unique. Among the other cases that I've looked at that discuss the physical draft of testing is Mr. Aday's particular mental status relative to his Asperger's syndrome, and that sort of thing, which I believe the court addressed during sentencing and talked about during May and that sort of thing. And so it's our position that because there wasn't any sort of analysis, the appellate rate for the sentencing didn't apply to the plea agreement. Thus giving rise to this work that we've done to review the merits of the consistency of testing and the lack of any sort of analysis by the trial court. Now, as to the merits, what are your thoughts? Again, and that's why I brought up the Asperger's syndrome. Clearly, this was done in the past. I don't know if it's clear. In the record, there is some reference to the fact that he had a psychiatric report that was submitted. The PSR made reference to it. He had Asperger's and became very, because of that, or it was a mild form of Asperger's, became very obsessed with law enforcement. Well, now, does this go to the sentencing conditions or to the delegation to the probation officer argument that you're making? The sentencing conditions. Okay. More specifically, how is Asperger's in its mild form relevant to the testing requirement? Well, my thinking is that, you know, when we look at Weber, and the discussion about plethysmograph testing and its reliability and that sort of thing, I think that when you have a defendant that isn't just sort of caught with child pornography, and the other defendant has these sorts of potential, oh, there we go, sorry, potential psychological issues, the reliability of plethysmograph, I think, comes into question, which also should. Well, I guess what I'm asking is more specific than that. A mental or emotional problem or disorder can be a variety of different kinds, and I'm not an expert on this, but I thought Asperger's primarily had to do with whether a person is successful in making eye contact and having, you know, ordinary interactions with people. But how is that, what's the relationship between that and this condition? Well, I think that it goes to the reliability of whether plethysmograph would be applicable to the defendant in this case, that he isn't sort of your average guy off the street, that he does have these issues. And I don't know, and again, I don't pretend to be an expert in Asperger's either, I don't know that, you know, plethysmograph tests, as near as I can gather, are a very specific reaction that individuals have when they look at pictures, images, or, you know, audio files and that sort of thing. I don't know how that's, the question that I have when I read this is, how does that affect whether plethysmograph testing should be applied in this case? But if we don't know, how can it be plain error? I mean, it could be appropriate or it could be not appropriate is what you're saying. But when it wasn't challenged at the district court, there's no opportunity to make a record whether it is or it isn't appropriate. And I think that's the crux of the matter here in the sense that, obviously, this Court has held that, you know, the plethysmograph testing has a particularly significant liberty interest in the sense that it's, you know, pretty invasive and that heightened findings need to be made by the trial court, which didn't happen here. And then, you know, when we start talking about plain error. Is it your view that that's plain error all by itself without any demonstration of a different outcome? Had there been findings? Well, you know, my hands become tied in trying to determine whether there would have been a different outcome. But I think that if we look at this defendant and these mental issues, that if the matter had been litigated, there might have been a different outcome. We may find that, in fact, you know, if he has Asperger's, I don't know that plethysmograph will get the benefits that you talk about when you're looking at, when you look at what this Court said in Weber in the sense that, you know, I don't know what the intended benefits are and whether they would be applicable to this defendant. We just don't know because that analysis was never made. And, of course, the objection was never raised. And I'm not trying to say that it was. Do you seem to believe that the fact that he has Asperger's syndrome would be a confounding element with the application of the plethysmograph? Correct. Is there anything in the record which so, any affidavit, is this argument without fact? Yes. You know, I mean, in the sense that it struck me as being important in this case and should have been a question that was asked or should have been asked or addressed by the Court. You know, the PSR is silent on it. The Court is silent on its sentencing. Defense counsel is silent on it as far as any sort of objections or argument as to those things. It looked to me that, if nothing else, defense counsel was very concerned with making sure the plea agreement got accepted. Is there anything that you urge is lastingly injurious to your client because of the application of plethysmograph testing? I don't think we know because that issue was never litigated. I don't know that it ---- All right. But there's nothing in the record which would indicate any such injury. By the mere testing of it, right? Correct. I mean, that issue was never litigated. Okay. With that being said, I think that ---- If this becomes an issue, can't you go back to the trial court and seek a modification of some sort in terms of the terms of the supervisory release? I think so. I think that when I was discussing that sort of issue, I mean, obviously he gets out in 2024, I think, is his release date. It's in my brief. And I don't know what the psychological or psychosocial testing is going to be in 2024. I don't think any of us know. So, you know, in that sense, it may not be an issue. But at the same time, if he is then, you know, sort of violated from supervisory release because he refuses to do so, or, in fact, the testing causes him to act out further, then that becomes an issue and might be important to solve now to avoid that potentially down the road. If I could, I guess, save the rest of my time. Thank you. You may reserve the remaining time for rebuttal. We'll hear now from the government. Good morning. May it please the Court. My name is Bridget Beatty. I'm appearing on behalf of the United States. I agree with Mr. Hantel that the two primary issues before the Court this morning are the validity of the appeal waiver and whether there was plain error in the analysis of the plethysmograph testing. I want to ask you about the second issue. And we have said that there have to be specific kinds of findings made in order to have this condition. And my question to you is whether the district court's failure to make the required findings is, in itself, a plain error. No. And the reason that it is not plain error in and of itself is that we have to apply the plain error analysis. And if we say that the district court did not articulate specific findings about plethysmograph testing, is that error? It may be error. But then did it prejudice the defendant? Did it affect his substantial rights? And the answer to that would be no. So the plain error analysis would fail. And then the fourth prong, whether the Court should reach it. Why is the answer no? The answer is no because it wouldn't make a difference. I believe that was alluded to in an earlier question. The district court judge very thoroughly discussed this defendant's characteristics, his psychiatric evaluation, the concerns of deterrence, protection of the community, his need for sex offender treatment and counseling. She emphasized that when he was committed to the Bureau of Prisons that he should be sent to a facility to emphasize treatment and counseling for him. All indications in the record are that she went through the substantive findings that would support plethysmograph testing and then included it as one of the types of testing that could be imposed in 2024 when he's released. And so the indication is that the district court did not make the explicit findings, but she went through the substantive findings and the result would have been the same if there had been an objection and she articulated the missing pieces, if you will, which are that I've considered the failings of plethysmograph testing and I believe it's appropriate in this case, which is essentially all that she did not articulate, although she went through all the substantive factors leading up to it. And then the other reason it wouldn't meet the plain error analysis is, of course, if you get to the first three parts of the test, the fourth part requires the test the court to decide that, you know, fairness, integrity, the judicial reputation is affected. And it is not in this case because, as the Court has already mentioned, when Mr. Adai is released in 2024, he can seek a modification if the condition is even imposed. We're talking about something many, many years from now that is now an option for treatment but may not ever be ordered. And if it is, he doesn't have to violate supervised release. He can seek a modification. So this is not a situation that the reputation of the court or the fairness or integrity of the court would be implicated. And so it doesn't meet the plain error analysis. The Court asked about Asperger's syndrome. And I would comment that the record does not reflect anything to suggest that Mr. Adai's Asperger's syndrome affected his ability to understand the proceedings. He was working to become an EMT. He held a job. He was articulate. He answered several times in court that he understood. He'd read the plea agreement. He'd had the opportunity to discuss it with counsel. He entered a knowing and voluntary plea agreement with an appeal waiver. He was asked many times at the change of plea and at sentencing, did you read this? Did you understand it? Are you satisfied with your counsel? Did you have an opportunity to talk with them? So there's nothing that suggests that the syndrome that he has, as the psychiatric evaluation described in a mild form, affected his ability to participate in the court proceeding and to understand what he was doing. I don't think that was counsel's argument. As I understood it, at least, his argument was that this condition makes the testing potentially either ineffective or injurious in some way. I think at least I understood that he was relating it to the testing condition and not to the voluntariness. Well, I did not mean to put words in counsel's mouth. I understood the question from the court to be going at did this affect his ability to understand what he was agreeing to and to what he was doing. As far as the other issue, there's nothing in the record that suggests that Clifton's McGrath testing is injurious to anyone or that it would be injurious to this particular defendant. There was nothing that tied Asperger's to that. As the court noted, it's a mild form of autism. There was nothing to suggest that there was any danger presented to the defendant. And importantly, he didn't object to this procedure and had multiple opportunities to do so. In Weber, Williams, and Cope, the three cases that talk about conditions of supervised release that implicate significant liberty interest and require heightened findings, all of those defendants objected. They filed sentencing memoranda in which they objected. They objected and argued in court. They did not voluntarily agree to it. They did not have these terms in their plea agreement. And so if they have, as in this case, the defendant agreed to it in a negotiated plea agreement that his sex offender treatment could include this type of testing, and then repeatedly stood by that plea agreement in court in the change of plea and that sentencing, and in response to the PSR, which talked about this testing and also mental health treatment, and never objected, thus showing his agreement that he was submitting to this testing and that that takes this from, makes it a different case than a case where it's, as it was in Weber, forced antipsychotic medications, or in Cope where they talked about chemical castration, you know, if imposed against the defendant's will. Those cases are all in terms of against the defendant's will, and it affects the significant liberty interest. With the defendant's agreement, it would not do so. And so the district court sees the defendant's agreement to agree to this sort of testing, goes through the substantive analysis of the need for deterrence, the incredible effect on the community of this crime, in which, as the Court will recall, the defendant posed as a law enforcement officer, took young girls into his custody, and then molested them. This, he was at large for quite a period of time. This was a terrible event in the community, widespread fear. His crimes were planned, took, he laid in wait for his victims, and this was a very serious issue, and the Court was quite concerned about the protection of the public, deterrence and rehabilitation for the defendant, and she talked at length about those issues at sentencing, and then concluded that as part of a sex offender treatment, plethozomograph could be part of the testing. If we get to that point in 2024, and it is advised by the probation office. The first issue that we should address is the appeal waiver, because the defendant knowingly and voluntarily entered this plea agreement, and it included a valid appeal waiver. And the district court did not clearly err by finding that her sentence was consistent with the plea agreement. The defendant argues that the language is ambiguous and must be read to require the specific findings, but there is nothing in the plain language of the agreement that required the findings. And. But there were no findings made. I think the government concedes that. Yes, we concede that she did not make the, the Court did not make specific findings related to plethozomograph testing. But the district court would receive this plea agreement where the defendant had agreed to this, and there is no objection. So there is nothing to trigger those findings before the district court. And the, you know, this Court's case law tells us we look to the objective interpretation of the plea agreement and what did the parties intend. And why did this defendant enter this plea agreement? What, what was he given? What was the bargain? And it wasn't specific findings. It was a term, the 240 months. And that is shown not only by the plain language of the plea agreement, which does not require the specific findings, but also by his conduct throughout the proceedings. And it's the Poole v. Brown case that says we look at the plain language of the plea agreement and also the defendant's conduct at the change of plea, and that shows us the intent. And in this case, with no objections at any stage, it's clear that the defendant did not believe that he had bargained for certain types of findings and even filed an Anders brief, and then the defendant himself did not file a Per Se brief objecting to that. There's never been any indication from this defendant that he thought the agreement meant something different. And how do you handle the issue of whether this person may be given antipsychotic medication and thereby invade a liberty and arrest without a court finding that is medically necessary? I have just under a minute, so I will try to answer in less than a minute. The Court did not make the medically grounded findings to impose a psychotropic or antipsychotic medications or chemical castration, and there's nothing in the record to suggest that that was the intent. She ordered that he would go to mental health treatment that could include taking prescription medications. And in Cope and Daniels, this Court instructed that if the findings are not made, then the order is read to not include those medications. And so the government is not here seeking to have Mr. Day be subjected to antipsychotic medications or chemical castration. We would suggest or argue that the Court should read the order not to include medications that affect substantial liberty interest. And in Cope, the Court talked about how at this point only two types of medication have been identified in that category, and there could be other medications that exist or maybe don't exist yet. And at some point in the future, there could be medications that are identified as affecting this liberty interest, but we don't know what they are now. Thank you, counsel. Your time has expired. Thank you. Mr. Huntel, you have some reserve time. I will try to be brief. The first thing that struck me when I was listening to opposing counsel's argument is that the terms requiring placismograph to be analyzed under case law as well as the facts of the case are not a common thing that we see in the plea agreements. I think this Court has seen a number of plea agreements, and if you look at that, that was a special term that was particular to this case. So I think that there was contemplation with the drafters as that this was going to be an issue, that placismograph was something that required additional findings. The second thing that struck me was, you know, when we talk about the sex offender terms that the Court pronounced at sentencing, we look at those, and they are common to many of the sentencings that this Court is going to see, and that it's a lump, you know, verbatim thing that the Court reads and has put in these pre-sentence reports. Again, that does not show that there are – that there was any sort of consideration by the Court as to the particular application of placismograph testing to this defendant. With that, I would sit down. Roberts. Thank you very much, counsel. The case just argued will be submitted for decision, and we will hear argument next in Cross v. Sisto. Thank you, counsel.
judges: O'scannlain, Graber, Bea